# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

DENNIS BAMBER,                                    )
    Plaintiff,                              )
                                            )
v.                                               )
                                            )
STEPHEN ZAPF and                                 )
RICHARD ZAPF,                                    )
    Defendants.                             )
-------------------------------------------------- )   CAUSE No.: 3:06-CV-823-TLS
STEPHEN ZAPF and                                 )
RICHARD ZAPF,                                    )
    Third-Party Plaintiffs,                 )
                                            )
v.                                               )
                                            )
DENNIS BAMBER, BARRINGTON                        )
MUSIC PRODUCTS, INC., WOODWARD                   )
CONTRACTING GROUP, INC., BAMBER                  )
LLC, and JOHN DOE CORPORATIONS                   )
1-10,                                            )
    Third-Party Defendants.                 )

## OPINION AND ORDER

In October 2006, the parties to this lawsuit entered into a Standstill Agreement. The issue

before this Court, upon the parties' motions for summary judgment, is whether the Standstill

Agreement required Dennis Bamber and the other Third-Party Defendants to turn over certain

payments to Stephen and Richard Zapf.

## BACKGROUND AND STATEMENT OF FACTS

Stephen and Richard Zapf are brothers who, in 1999, launched an online retailer of

musical instruments and related products, called "Music123.com." Dennis Bamber owned DBI,

which sold musical instruments in a retail store in Indiana and through a catalogue under the

brand name Woodwind Brasswind. In 2002, the Zapfs merged their business with DBI and, in

exchange for their interests in Music123, the Zapfs acquired 25% of DBI. Bamber owned the remaining 75% of the shares. Stephen Zapf later purchased another 3% of the shares in DBI, leaving Bamber with 72% of the shares. After the merger, DBI employed the Zapfs. In 2004, the Zapfs and Bamber entered into discussions for the Zapfs to buy Bamber's DBI stock. The Zapfs contend that an amount was agreed upon, but that instead of going through with the deal, Bamber terminated their employment and asserted that it was for cause. The Zapfs sued Bamber and DBI in the United States District Court for the District of New Jersey (the New Jersey Lawsuit), alleging breach of the agreement to purchase stock, termination without cause for the purpose of discounting the value of the Zapfs' stock, enforcement of the DBI stockholder agreement provision requiring that DBI purchase the Zapfs' stock at fair market value if they were terminated without cause, and tortious interference with their employment. In March 2006, the parties reached a settlement in which DBI agreed to purchase the Zapfs' stock for $9 million in return for the Zapfs' dismissal of claims against DBI and Bamber. A written settlement agreement was to follow, however, issues regarding the tax consequences of the settlement, and the parties' failure to agree whether the payment to the Zapfs would be considered wages or capital gains, caused DBI to assert that the settlement was null and void. The Zapfs filed a motion in the New Jersey Lawsuit to enforce the settlement. On September 12, 2006, the district court entered judgment for the Zapfs and against DBI in the amount of $9 million, plus interest, fees, and costs (the Judgment or New Jersey Judgment). According to the Judgment, the entire $9 million was made payable at once and could be executed in ten days.

In October 2006, Bamber and DBI informed the Zapfs that they wished to market DBI or its assets for sale to a third party. They sought the Zapfs' consent to the process, as well as an

agreement that the Zapfs would not execute on the New Jersey Judgment. On October 4, 2006,

the Zapfs, Bamber, DBI, NHF Musical Merchandise, Barrington Music Products, Woodwind

Contracting Group, and Bamber LLC (collectively the Signatory Affiliates), entered into a

Standstill Agreement. The Background section of the Standstill Agreement stated that, pursuant

to the terms set forth in the Agreement, "the parties have agreed to market DBI for sale to a

third-party buyer (the 'Sale Process') in an effort to resolve the parties' disagreements with

respect to the New Jersey Judgment without further litigation, collection proceedings or the

filing of a Chapter 11 case by DBI." (Agreement ¶ C, ECF No. 23-2 at 2.) Under the terms of the

Agreement, a "Forbearance Period" was created "from and after September 12, 2006, and only

until January 6, 2007 or until earlier terminated pursuant to this Agreement." (*Id.* ¶ 1.) During

this time, the Zapfs agreed to refrain from taking any steps to collect upon the New Jersey

Judgment, recording the New Jersey Judgment, transferring or assigning any interest in the New

Jersey Judgment, and taking any action to perfect or cause the creation of a lien or other

encumbrance on DBI's assets. The Agreement continued with a definition of "Affiliates" as

> (i) the Signatory Affiliates, (ii) an entity that directly or indirectly owns, controls or
> holds 20% or more of the outstanding stock, partnership interests or membership
> interests of DBI or any of the Signatory Affiliates, and (iii) an entity 20% or more
> of whose outstanding stock, partnership interests or membership interests are directly
> or indirectly owned, controlled or held by DBI, Bamber or their Affiliates.

(*Id.*)

Next, the Agreement provided that, upon the closing of a transaction providing for the

sale of substantially all of DBI's assets, Bamber, DBI, and their Affiliates would forever forgo

the right to challenge the validity and priority of DBI's obligations to the Zapfs as unsecured

debt. In paragraph 3, the parties addressed certain litigation matters, particularly the actions they

would take "[u]pon the closing of a transaction providing for the sale of substantially all of the assets of DBI at a price meeting or exceeding the Minimum Price," which was defined elsewhere in the Agreement. (*Id.* ¶ 3.a., 3.b.) Paragraph 4 set forth provisions regarding written notice of breach and termination. Paragraph 5 described the Sale Process, and particularly identified Guitar Center, Inc., and its subsidiary Musician's Friend, Inc. (together, Guitar Center) as a preferred bidder for a specified period of time, but allowed DBI, Bamber, and their Affiliates to accept the highest and best bona fide offer in the event a sale to Guitar Center did not occur, and defined the "Minimum Price" of the sale. The parties agreed that "[u]pon closing of the sale of DBI, all cash received shall promptly be distributed to creditors in accordance with their priorities. The Zapf Debt shall be paid in cash at closing, to the extent sale proceeds are sufficient." (*Id.* ¶ 5.f.) The Zapf Debt was defined elsewhere as "debt [DBI] owed to the Zapfs . . . includ[ing] $1.2 million in legal fees and expenses plus the New Jersey Judgment." (*Id.* ¶ 5.a.)

Paragraph 6 provided the Zapfs access to DBI's financial information. Paragraphs 7 and 8 of the Standstill Agreement allowed DBI to pay the Zapf Debt in full and to purchase the Zapfs' stock in DBI for cash in the amount of the Zapf Debt. In paragraph 9, the parties clarified that, for tax purposes, any payment made in complete or partial satisfaction of the New Jersey Judgment would be allocable to the Zapfs' stock in DBI. Paragraph 10, titled Additional Agreements, is the paragraph that the Zapfs allege that Bamber and his Affiliates, the Third Party Defendants, have breached. The entirety of the paragraph is as follows:

> 10.    Additional Agreements: Subject to and conditioned upon the closing of a transaction providing for the sale of substantially all of the assets of DBI at a price meeting or exceeding the Bank Debt, (i) Bamber and his Affiliates agree to subordinate their unsecured claims against DBI (other than the claims allowed to be paid herein, to the extent so allowed to be paid) to the claims of all unsecured creditors and the Zapf Debt, except the $1.2 million in legal fees and expenses owed

4

to the Zapfs, which, under those circumstances, shall have the same priority as, and shall be paid concurrently and pro rata with, the subordinated claims owed to Bamber) to the extent that there are insufficient assets or proceeds available to pay or assume all of DBI's liabilities in full in any future circumstance; and (ii) DBI, Bamber and their Affiliates agree not to contest the fees and expenses applied for pursuant to the New Jersey Judgment. Notwithstanding any other provisions of this Agreement, no payments shall be made to Bamber or his Affiliates by DBI or its Affiliates or by any purchaser until the Zapf Debt (except the $1.2 million in legal fees and expenses owed to the Zapfs, under the circumstances and subject to the conditions provided above) has been paid in full, except (such exceptions, hereinafter collectively referred to as the "Allowed Payments") that (a) until such time as a sale of DBI's assets occurs, Bamber and his Affiliates may receive (i) aggregate lease payments at a level of $100,000 per month, provided that DBI and its Affiliates (other than Bamber) actually utilize the leased premises, (ii) Bamber's salary of $300,000 per year plus customary and ordinary health and welfare benefits he is receiving, and (iii) interest payments on debt owed to Bamber at the current contract rate not exceeding 0.5% below the prime rate (for the $1.0 million note) and 9.0% (for the $410,000 note), and (b) after a sale of DBI's assets occurs and until the payment in full of the Zapf Debt, Bamber and his Affiliates may receive (i) any lease payments with respect to assumed leases and (ii) any payments with respect to the secured debt owed to Bamber and his Affiliates so long as any such lease payments in excess of $50,155 per month for the 4004 Technology Drive building and $74,522 per month for the distribution center and any payments of such secured debt are, until the New Jersey judgment has been paid in full, turned over to the Zapfs to be applied to the New Jersey Judgment and, after the New Jersey Judgment has been paid in full until the Zapf Debt has been paid in full, any such lease payments in excess of $51,155 per month for the 4004 Technology Drive building and $74,522 per month for the distribution center and any payments of secured debt are turned over to the Zapfs so as to result in their being shared pro rata by the Zapfs and Bamber with respect to the $1.2 million in legal fees and expenses owed to the Zapfs and the $1.375 million in loans owed to Bamber. If Bamber or his Affiliates receive any payments from DBI or its Affiliates, other than the Allowed Payments, then, with respect to all payments other than those identified in clause (b) of this paragraph 10, he or they shall return such payments to DBI or such Affiliates within one (1) business day of receipt and, with respect to the payments identified in such clause (b) as subject to being turned over to the Zapfs, he or they shall turn over such payments to the Zapfs within one (1) business day of receipt in a manner consistent with such clause (b).

(*Id.* ¶ 10.)

After entering into the Standstill Agreement with the Zapfs, Bamber attempted to sell

DBI's assets to Guitar Center, but the parties did not agree to terms or close a sale. On

November 17, 2006, Bamber filed a Complaint for Declaratory Judgment in the St. Joseph County, Indiana, Superior Court, alleging that the Zapfs had made threats to sue him for breach of fiduciary obligation and breach of the Standstill Agreement, and requesting that the court declare that he did not breach any fiduciary corporate responsibility and declaring the rights of the parties under the Standstill Agreement. On November 21, 2006, DBI filed a voluntary Chapter 11 Petition in Bankruptcy in the United States Bankruptcy Court for the Northern District of Indiana under docket number 06-31800. In this proceeding, Bamber asserted a secured claim of $1 million and unsecured claims. In addition, the bankruptcy trustee asserted claims against Bamber in adversary actions, including claims that Bamber caused DBI to enter into the Settlement in the New Jersey Lawsuit fraudulently and to benefit himself personally. In 2007, Guitar Center purchased substantially all of DBI's assets as part of a sale approved by the Bankruptcy Court. In 2009, the bankruptcy trustee, on behalf of DBI and Bamber, entered into a settlement of the claims Bamber filed in the bankruptcy and the adversary actions the trustee filed against Bamber.

Meanwhile, the Zapfs had removed Bamber's Complaint for Declaratory Judgment to federal court, invoking its diversity jurisdiction, and filed an Answer. On December 10, 2009, the Zapfs filed a Counterclaim and Third Party Complaint alleging that Bamber breached his fiduciary duty and committed fraud during the course of the settlement of the New Jersey action. They also asserted that Bamber and the Third-Party Defendants, who were all parties to the Standstill Agreement, breached the Agreement when they failed to turn over certain payments to the Zapfs. After the completion of discovery, Dennis Bamber and Third-Party Defendants, Barrington Music Products, Inc., Woodwind Contracting Group, Inc., and Bamber LLC, moved

for Summary Judgment [ECF No. 62]. The Zapfs also filed their own Motion for Partial Summary Judgment [ECF No. 64] concerning the claims for breach of the Standstill Agreement. The Zapfs conceded dismissal of their breach of fiduciary duty and fraud claims against Bamber. (Defs.' Resp. in Opp'n to Pl.'s Mot. for Summ. J. 5, ECF No. 72 (stating that the Zapfs "acknowledge the difficulty in proving" the breach of fiduciary duty and fraud claims, and "therefore do not oppose their dismissal").) With respect to the Standstill Agreement, both parties adamantly maintain that the Agreement is unambiguous and they are entitled to judgment as a matter of law under their interpretation and application of the Agreement.

## ANALYSIS

### A.      Standard of Review

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, a nonmovant must be able to show that a reasonable jury could return a verdict in its favor; if the nonmovant is unable to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), summary judgment must be granted.

The standards for reviewing contracts are well established. Generally, construction of a written contract is a question of law for the trial court for which summary judgment is particularly appropriate. *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 613 (Ind. Ct. App. 2000) (citing *Mid State Bank v. 84 Lumber Co.*, 629 N.E.2d 909, 914 (Ind. Ct. App. 1994)).

Indiana courts recognize the freedom of parties to enter into contracts, and presume that contracts represent the freely bargained agreement of the parties. *Weaver v. Am. Oil Co.*, 276 N.E.2d 144, 147 (Ind. 1971). Under Indiana law, contracts are interpreted to ascertain and effectuate the intent of the parties as reasonably manifested in the agreement, and if the language of the contract is clear and unambiguous, it should be given its plain and ordinary meaning. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). Thus, courts give effect to the intentions of the parties as expressed in the four corners of the agreement, and determine the meaning of a contract from an examination of all of the contract's provisions, not from a more narrow consideration of individual words, phrases, or paragraphs read alone. *Moore v. Wells Fargo Constr.*, 903 N.E.2d 525, 531 (Ind. Ct. App. 2009). Parol, or extrinsic evidence, is inadmissible to add to, vary, or explain clear and unambiguous terms of a written instrument. *Evan v. Poe & Assocs. Inc.,* 873 N.E.2d 92, 101 (Ind. Ct. App. 2007); *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 212 (Ind. Ct. App. 2007) (stating that "if the language of the instrument is unambiguous, the parties' intent will be determined from the four corners of the contract"). An ambiguity does not arise simply because the parties disagree on the interpretation; rather, contract language is ambiguous only if reasonable people could come to different conclusions about its meaning. *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distribs., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005). If an ambiguity in the contract does exist, a trier of fact must ascertain the facts necessary to construe the contract unless the court determines that the ambiguity can be resolved without the aid of a factual determination. *Rogier*, 734 N.E.2d at 613.

**B.      Interpretation and Application of Paragraph 10**

Bamber argues that the "entirety of the Standstill Agreement contemplated either that DBI would consummate a commercial sale to an interested third-party, or that the Zapfs would execute on their judgment at the conclusion of the forbearance period." (Mem. in Supp. 18, ECF No. 63.)  He asserts that the Agreement did not anticipate that this could be accomplished through Chapter 7 bankruptcy proceedings, and argues that, by its very terms, the Standstill Agreement was meant to operate in lieu of bankruptcy and that, once the bankruptcy was filed, there was nothing left for the Standstill Agreement to accomplish. The Zapfs argue that, under the terms of the Standstill Agreement, the only event that will terminate the Bamber Parties' obligations is payment in full of the amount owed to them by DBI.

The Standstill Agreement's stated purpose was to attempt to resolve the parties' disagreement with respect to the New Jersey Judgment without further litigation, without collection proceedings, and without the filing of a Chapter 11 case by DBI. However, the Agreement did not specifically address what would occur in the event that DBI filed for bankruptcy. The only time limits set forth in the Agreement were with respect to the Forbearance Period, which bound the Zapfs for a specific time from attempting to execute on their judgment. The Agreement could also be terminated upon breach by DBI, Bamber, or any of their Affiliates after the Zapfs provided the agreed-upon notice of such breach and termination. In the absence of any provision terminating the Agreement upon the filing of bankruptcy by DBI, whether the terms of the Standstill Agreement can still be accomplished despite the bankruptcy must be answered by looking to the specific provisions that the Zapfs seek to enforce—those contained in paragraph 10.

Three sentences make up paragraph 10. The terms in the first sentence are "[s]ubject to and conditioned upon the closing of a transaction providing for the sale of substantially all of the assets of DBI at a price meeting or exceeding the Bank Debt." If such a condition occurred, the Agreement set forth the priority of the various claims, including Bamber's unsecured claims against DBI, unsecured creditors' claims, the Zapf Debt, the Allowed Payments, and the $1.2 million in legal fees. The Zapfs do not contend that the first sentence of paragraph 10 is at issue in this litigation.

The second sentence of paragraph 10 begins with the phrase: "Notwithstanding any other provisions of this Agreement." It then states that no payments shall be made "to Bamber or his Affiliates by DBI or its Affiliates or by any purchaser until the Zapf Debt" is "paid in full." However, the parties specifically excluded certain payments from this prohibition, which were referred to as "Allowed Payments." Before a sale of DBI's assets (clause (a) of the second sentence), Bamber and his Affiliates were allowed to receive a certain amount in lease payments, and Bamber was permitted to receive his salary of $300,000, and interest payments on debt owed to him. After the sale of DBI's assets (clause (b) of the second sentence) and "until the payment in full of the Zapf Debt," Bamber and his Affiliates were allowed to receive: (1) lease payments with respect to assumed leases; and (2) payments of secured debt owed to Bamber. However, any excess lease payments (as defined in the Agreement) and any payments of secured debt had to be "turned over to the Zapfs to be applied to the New Jersey Judgment" until it was paid in full. After the New Jersey Judgment was fully paid, these excess lease payments and any payments of secured debt still had to be "turned over to the Zapfs" but for the purpose of "being shared pro rata by the Zapfs and Bamber with respect to the $1.2 million in legal fees and

expenses owed to the Zapfs and the $1.375 million in loans owed to Bamber."

The third, and final, sentence of paragraph 10 provides that if "Bamber or his Affiliates receive any payments from DBI or its Affiliates, other than the Allowed Payments, then, with respect to all payments other than those identified in clause (b)" of the second sentence, they had to "return such payments to DBI or such Affiliates." With respect to payments that were already identified in clause (b) as subject to being turned over to the Zapfs, Bamber or his Affiliates had to "turn over such payments to the Zapfs."

Thus, the unambiguous language of paragraph 10 of the Agreement contemplated that Bamber and his Affiliates would not receive any payments from "DBI or its Affiliates or by any purchaser" until the Zapf Debt was paid in full, except for certain Allowed Payments. The Allowed Payments discussed in clause (a) of the second sentence do not apply to the claims in this litigation because clause (a) only operates before the sale of DBI's assets, and Bamber received the payments the Zapfs are attempting to recover after the sale of DBI's assets through the bankruptcy proceedings. The provision for Allowed Payments set forth in clause (b) includes exceptions for excess lease payments and secured debt. Under clause (b) of the second sentence, and under the third sentence, Bamber or his Affiliates were to turn over these excess lease and secured debt payments to the Zapfs. The Agreement requires that any remaining payments that are not Allowed Payments and do not fit within clause (b)'s turnover provision are to be returned to DBI or the Affiliate from which the payment originated. Even though the Agreement contemplates that Bamber and his Affiliates are not to receive any payments from DBI, its Affiliates, or a purchaser until the Zapf Debt is paid in full, except those payments specifically allowed, the Agreement only described two options for what should happen to such forbidden

payments to Bamber or his Affiliates: those payments were either to be (1) turned over to the Zapfs or (2) returned to DBI or the Affiliate. The following chart of the various scenarios contemplated by paragraph 10 illustrates this limited scope:

### SCENARIOS PER PARAGRAPH 10 OF STANDSTILL AGREEMENT

| | *Payment To* | *Payment From* | *When* | *Type of Payment* | *Consequence* | *Contract Source* |
|---|---|---|---|---|---|---|
| 1 | Bamber or his Affiliates | DBI, its Affiliates, or purchaser | Before sale of DBI assets | Lease up to $100,000/mo. | Bamber can keep-Allowed Payment | Par. 10, Sentence 2, Clause (a) |
| 2 | Bamber or his Affiliates | DBI, its Affiliates, or purchaser | Before sale of DBI assets | Bamber salary up to $300,000/yr. | Bamber can keep-Allowed Payment | Par. 10, Sentence 2, Clause (a) |
| 3 | Bamber or his Affiliates | DBI, its Affiliates, or purchaser | Before sale of DBI assets | Interest payment on debt owed to Bamber | Bamber can keep-Allowed Payment | Par. 10, Sentence 2, Clause (a) |
| 4 | Bamber or his Affiliates | DBI, its Affiliates, or purchaser | After sale of DBI assets; before NJ Judgment paid | Assumed lease payments up to $50,155 for building, $74,522 for distribution ctr. | Bamber can keep-Allowed Payment | Par. 10, Sentence 2, Clause (b) |
| 5 | Bamber or his Affiliates | DBI, its Affiliates, or any purchaser | After sale of DBI assets; before NJ Judgment paid | Assumed lease payments over amount stated directly above | **Turned over to Zapfs to apply to NJ Judgment** | Par. 10, Sentence 2, Clause (b) |
| 6 | Bamber or his Affiliates | DBI, its Affiliates, or any purchaser | After sale of DBI assets; after NJ Judgment paid | Assumed lease payments up to $51,155 for building, $74,522 for distribution ctr. | Bamber can keep-Allowed Payment | Par. 10, Sentence 2, Clause (b) |
| 7 | Bamber or his Affiliates | DBI, its Affiliates, or any purchaser | After sale of DBI assets; after NJ Judgment paid | Assumed lease payments over amount stated directly above | **Turned over to Zapfs for pro rata sharing of legal fees & Bamber loan** | Par. 10, Sentence 2, Clause (b) |
| 8 | Bamber or his Affiliates | DBI, its Affiliates, or any purchaser | After sale of DBI assets; before NJ Judgment paid | Payment of secured debt owed to Bamber and his Affiliates | **Turned over to Zapfs to apply to NJ Judgment** | Par. 10, Sentence 2, Clause (b) |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9 | Bamber or his Affiliates | DBI, its Affiliates, or any purchaser | After sale of DBI assets; after NJ Judgment paid | Payment of secured debt owed to Bamber and his Affiliates | **Turned over to Zapfs for pro rata sharing of legal fees & Bamber loan** | Par. 10, Sentence 2, Clause (b) |
| 10 | Bamber or his Affiliates | DBI or its Affiliates | Before sale of DBI assets | Any payment not fitting the definition of an Allowed Payment | Return payment to DBI or such Affiliate | Par. 10, Sentence 3 |
| 11 | Bamber or his Affiliates | DBI or its Affiliates | After sale of DBI assets | Any payment not fitting the definition of an Allowed Payment | Return payment to DBI or such Affiliate | Par. 10, Sentence 3 |
| 12 | Bamber or his Affiliates | A purchaser of DBI's assets | After sale of DBI assets | Any payment not fitting the definition of an Allowed Payment | Not Addressed in the Standstill Agreement | Not Addressed in the Standstill Agreement |

This chart, in addition to showing what was contemplated by the language of paragraph 10, illustrates that not all payments to Bamber are governed by the Standstill Agreement. However, before analyzing the specific payments the Zapfs contend Bamber should have turned over to them, the Court must make another point of clarification by addressing the parties' disagreement regarding which sources of payments would trigger turnover or pay back obligations. Bamber contends that the only payments the Zapfs were entitled to receive under clause (b) were those Bamber or his Affiliates received directly from "DBI or its Affiliates or by any purchaser." The third sentence contains the same "DBI or its Affiliates" language but omits "purchaser." Bamber argues that this wording does not encompass any payments that he received from one of his own Affiliates. He also states that DBI does not have any affiliates. The Zapfs assert that the "sources of payments specified in paragraph 10" as subject to turnover to the Zapfs "included DBI, any Affiliate of DBI *or Bamber*, and any purchaser of DBI or its assets."

(Defs.' Resp. 10, ECF No. 75 (emphasis added).) The Zapfs then note that the term "Affiliates" is defined in the Agreement as follows:

> "Affiliates" shall mean (as applicable): (i) the Signatory Affiliates, (ii) an entity that directly or indirectly owns, controls or holds 20 % or more of the outstanding stock, partnership interests or membership interests of DBI or any of the Signatory Affiliates, and (iii) an entity 20% or more of whose outstanding stock, partnership interests or membership interests are directly or indirectly owned, controlled or held by DBI, Bamber or their Affiliates.

(Agreement ¶ 1.)

A plain reading of paragraph 10 does not, as the Zapfs argue, apply to payments from any Affiliate meeting the definition of an Affiliate provided in paragraph 1. The phrases "Bamber and his Affiliates," "DBI and its Affiliates," "DBI, Bamber or their Affiliates" and "DBI, Bamber and their Affiliates" are all used in the Standstill Agreement. However, the recipients of the payments that are the subject of paragraph 10 are limited to "Bamber or his Affiliates," and the sources of these payments are limited to "DBI or its Affiliates." "Words used in a contract are to be given their usual and common meaning unless, from the contract and the subject matter thereof, it is clear that some other meaning was intended." *Hilbert v. Conseco Servs., L.L.C.*, 836 N.E.2d 1001, 1008 (Ind. Ct. App. 2005) (citing *Exide Corp. v. Millwright Riggers, Inc.*, 727 N.E.2d 473, 478–79 (Ind. Ct. App. 2000)). The Standstill Agreement's definition of Affiliates specifies the amount of interest (at least 20%) that must exist to be considered an affiliated entity of another, but it does change the interpretive impact of the possessive pronoun "its" in the phrase "DBI or its Affiliates." Considering both the definition of an Affiliate, and the plain meaning of the possessive pronoun, the definition of a DBI Affiliate is any entity of which DBI owned 20% or more of the stock or interest, or any entity that owned 20% or more of DBI's stocks or interest. Under the plain and unambiguous terms of the Standstill Agreement, only

14

those payments originating from DBI or an entity meeting these parameters are included in the obligation for turnover to the Zapfs or the obligation to return the payment to DBI or the Affiliate.

When advancing their argument that Bamber breached the Standstill Agreement by failing to turn over payments, the Zapfs did not confine the sources of the payments to those expressed in the Agreement. Neither does their argument recognize the limited category of payments that required turnover, as illustrated by the chart above. The Court will address each payment cited by the Zapfs to determine whether it was a payment contemplated by the plain and unambiguous wording of the Agreement.

1.    ***Payments from Guitar Center to Bamber and Affiliates Barrington and Woodwind***

After Guitar Center purchased the assets of DBI, it paid Bamber $120,000 in consulting fees. The Zapfs assert that, under the Standstill Agreement, Bamber was required to turn over to them any payments he received from the purchaser of DBI's assets. In addition, one of the Signatory Affiliates, Barrington Music Products, received payments from Guitar Center in 2007, 2008, and 2009. Guitar Center also forgave obligations of Barrington and another Signatory Affiliate, Woodwind Contracting Group. The Zapfs argue that these payments and the forgiveness of debt, which Bamber negotiated during Guitar Center's acquisition of DBI's assets in the bankruptcy, must be turned over to the Zapfs.

With regard to the $120,000 salary, it was payment from a purchaser after the sale of DBI's assets. It is not payment of excess lease or secured debt. It falls within the category of payments identified in row 12 of the Court's Paragraph 10 scenarios chart. The Standstill

Agreement does not require that such payments be turned over to the Zapfs. In fact, the Agreement does not even address what should happen to such payments, and thus does not govern them. A court is to give effect to the intentions of the parties as expressed in the four corners of the document, and nowhere does the Standstill Agreement require that payment of salary from a purchaser of DBI's assets be turned over to the Zapfs. *See Poe & Assocs.,* 873 N.E.2d at 98 ("We will neither construe clear and unambiguous provisions nor add provisions not agreed upon by the parties.") (citing *Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 889 (Ind. Ct. App. 2001)). Likewise, the debt forgiveness, if it is considered a "payment" from a purchaser, is not subject to turnover because it is not an excess lease or secured debt payment. For these reasons, Bamber is entitled to summary judgment on the counterclaim for breach of contract related to the $120,000 payment from Guitar Center and their forgiveness of debt.

2. *Payment from the Sale of Woodwind and Brasswind of Paris*

Bamber owned 20% or more of Woodwind and Brasswind of Paris, which operated a musical instrument store in Paris, France. A venture capital group purchased Bamber's portion of stock for $3.124 million. The Zapfs argue that Bamber was required to turn over the payment he received for the sale of his interest in this Affiliate.

The Zapfs identify Woodwind and Brasswind of Paris as the source of Bamber's payment. Bamber asserts that the source of the payment was the venture capital group that purchased the stock. In any event, neither the venture capital group nor Woodwind and Brasswind of Paris are DBI Affiliates. In addition, even if the Zapfs were correct that the source

of Bamber's $3.124 million for his sale of stock satisfied paragraph 10's requirements, the Agreement still does not require that a non-allowed payment made to Bamber after the sale of DBI's assets be turned over to the Zapfs. Only payments for the secured debt or excess lease payments were required to be turned over to the Zapfs. If the Standstill Agreement addresses the payment at all, it could only be through the directive in sentence 3 of paragraph 10 to return the payment to the Affiliate, in this case Woodwind and Brasswind of Paris. The Zapfs have not sought this specific performance, or otherwise established that they have suffered damages as a result of Bamber's failure to return the payments to Woodwind and Brasswind of Paris.[1] Accordingly, Bamber is entitled to summary judgment on the counterclaim for breach of contract related to the payment for his sale of stock in Woodwind and Brasswind of Paris.

3.      *Bamber LLC Sale of Commercial Property*

Bamber owned Bamber LLC, which in turn owned two properties that DBI rented. Later, Guitar Center rented these same facilities. In 2009, a third party purchased one of the buildings from Bamber LLC for almost $7 million. Bamber received an $879,838 distribution from Bamber LLC as a result of this sale. The Zapfs assert that Bamber has breached the Standstill Agreement because he did not pay them the $879,838.

The money that Bamber LLC received for the sale of its property came from a third party purchaser, not from DBI or a DBI Affiliate. The $879,838 that Bamber received came from one of his own Affiliates, not from DBI or a DBI Affiliate. Even if the Standstill Agreement were

---

[1] The fact that such a remedy would not even appear to aid the Zapfs suggests that the source of payment (DBI or its Affiliates) was never intended to encompass entities that were only Affiliates of Bamber.

ambiguous regarding which sources of payments would trigger any of paragraph 10's obligations, the only consequence contemplated by paragraph 10 for payments received after the sale of DBI assets that are not excess lease or secured debt payments is to return the payments to DBI or the Affiliate. Under no provision of the Standstill Agreement are such payments to be turned over to the Zapfs. The Zapfs have not sought this specific performance, or otherwise established that they have suffered damages as a result of Bamber's failure to return the payments to Bamber LLC, a company against which the Zapfs have no claims or judgments. Bamber and the Third-Party Defendants are thus entitled to summary judgment on the breach of contract claim related to these payments.

**4.** ***Payments from the Bankruptcy Trustee***

The Zapfs identify three payments that they contend Bamber received from the bankruptcy trustee that he was required to turn over to them. First, the Zapfs contend that Bamber received $300,000 from DBI's bankruptcy estate to satisfy the $1 million secured claim he filed in the bankruptcy court, and that this payment "is clearly a payment that Mr. Bamber was required to turn over to the Zapfs under the Standstill Agreement." (Defs./Third-Party Pls.' Br. 8, ECF No. 65.) Second, the Zapfs assert that DBI released a life insurance policy that it held on Bamber's life to Bamber as part of a settlement between the estate and Bamber, and that the policy's cash surrender value of $252,575 should be turned over to them. Last, the Zapfs note that in addition to receiving $300,000 on his $1 million secured claim against the DBI bankruptcy estate, Bamber secured a waiver of claims that the DBI estate had asserted against him in exchange for Bamber's waiver of the secured claim. The Zapfs argue the dismissal of the

adversary action in exchange for the waiver of his secured claim constitutes a $700,000 value, or payment, to Bamber.

Assuming that the bankruptcy trustee stands in place of and is the equivalent of DBI under the Standstill Agreement, Bamber nevertheless contends that no recovery is warranted for any of these payments. First, with respect to the Zapfs' assertions regarding the life insurance policy, Bamber argues that the Zapfs have misstated the record, and that he did not receive any value with regard to the policy. The bankruptcy filings establish that the trustee assumed the life insurance policies and then surrendered them to the insurer in exchange for receipt of the cash value of the polices. (Agreed Order on the Motion for Authority to Assign and Sell Certain Life Insurance Policies, ECF No. 71-2 at Exhibit B Page 91–92.) The Zapfs' designated evidence, which consists of an accounting for DBI showing a line item asset of $252,575 for Cash Surrender Value Life, and Bamber's deposition testimony that the trustee unsuccessfully made a claim for a life insurance policy he personally owned, does not create any material issues of fact; it does not contradict the bankruptcy filing or reasonably suggest that Bamber received a payment from DBI for DBI-owned policies during the course of the bankruptcy. Bamber is thus entitled to judgment as a matter of law on the Zapfs' claim for $252,575 for the cash value of a life insurance policy.

It is undisputed that the $300,000 payment is a payment from DBI (acting through the bankruptcy estate and the trustee). According to paragraph 10 of the Standstill Agreement, it is a payment that was required to be turned over to the Zapfs because it was a payment for Bamber's secured debt. In defense, Bamber argues that the secured debt was specifically raised, litigated, and compromised in the bankruptcy proceeding, resulting in accord and satisfaction. In making

this argument, Bamber relies on joint motions that he and the Zapfs filed with the bankruptcy trustee seeking approval of their settlement. The relevant facts are set forth below.

On May 9, 2007, the DBI bankruptcy was converted from Chapter 11 to a Chapter 7 bankruptcy. On May 31, 2007, Bamber moved to allow the payment of his secured claim of $1,003,089.04, based upon a secured loan of $1 million to DBI (Claim No. 308), and payment of his unsecured claim of $376,243.15, based upon an unsecured loan to DBI of $400,000 (Claim No. 309). On June 22, the Zapfs objected to the allowance of the claims and argued that any payments on Bamber's secured claim had to be turned over to them for payment of the New Jersey Judgment in accordance with the Standstill Agreement. The bankruptcy court indicated that it would await the outcome of the adversary proceedings that the trustee had filed against Bamber and the Zapfs before addressing the objection. The trustee's position was that the Zapfs' claim was subordinated to the claims of all the general unsecured creditors, and that Bamber's claims were subordinated to the Zapfs' claims. The trustee also pursued additional claims against Bamber. The adversary proceeding concluded with the settlement of the Bamber claim on September 1, 2009, and the Zapfs' claims on October 7, 2009.

On May 19, 2009, the trustee filed a Joint Motion for Approval of Mr. Bamber['s] Compromise and Settlement, proposing a settlement of $300,000 in full and final satisfaction of all claims that Bamber had against the trustee or the estate. The Zapfs filed an objection, again claiming a right under the Standstill Agreement to any payment made to Bamber for the secured claim, including the $300,000 the trustee was proposing to pay Bamber. The Zapfs stated that if the amount was paid to them, they had no further objection to the trustee's Motion for Approval. On August 28, 2009, the bankruptcy court approved the Bamber Compromise and Settlement.

On September 9, 2009, the trustee filed a Motion for Approval of Compromise and Settlement of the Zapf Claims. The trustee requested that the court enter an order allowing the Zapf claims as a general unsecured nonpriority claim against the DBI estate in the total amount of $6 million, and stated that the Zapfs agreed that any distribution on account of the $6 million claim would be in full and final satisfaction of any and all Zapf claims. As part of the settlement, the Zapfs agreed to withdraw their objection, which allowed the court to approve the settlement of substantial claims, including the Bamber claims. According to its terms, the Zapf Settlement was not to constitute a waiver or release of any claims the Zapfs "may assert or have already asserted against Dennis Bamber individually." On October 7, 2009, the bankruptcy court approved the Zapf Compromise and Settlement.

On November 4, 2009, the trustee filed a Request with the bankruptcy court to allow the Zapf claim in the amount of $6 million, which the court granted. The unsecured creditors recovered 4.93% of their claims in the bankruptcy, with the Zapfs recovering $295,890.10.

Citing the legal theory of accord and satisfaction, Bamber argues that the Zapfs cannot seek recovery of the $300,000 because they bargained away that claim in exchange for receiving heightened status of their unsecured claim in their own settlement and compromise with the trustee, and recovered nearly the same amount in exchange. "Accord and satisfaction is a method of discharging a contract, or settling a cause of action by substituting for such contract or dispute an agreement for satisfaction." *Daube & Cord v. LaPorte Cnty. Farm Bureau Co-op. Ass'n*, 454 N.E.2d 891, 894 (Ind. Ct. App. 1983) (citing *Sunderman v. Sunderman*, 63 N.E.2d 154, 165 (Ind. Ct. App. 1945)). "The term 'accord' denotes an express contract between two parties by means of which the parties agree to settle some dispute on terms other than those originally

contemplated, and the term 'satisfaction' denotes performance of the contract." *Wolfe v. Eagle Ridge Holding Co.*, 869 N.E.2d 521, 524 (Ind. Ct. App. 2007) (quoting *Mominee v. King*, 629 N.E.2d 1280, 1282 (Ind. Ct. App. 1994)). "As a contract, accord and satisfaction requires a meeting of the minds or evidence that the parties intended to agree to an accord and satisfaction." *Mominee*, 629 N.E.2d at 1282. The question of whether the party claiming accord and satisfaction has met its burden "is ordinarily a question of fact but becomes a question of law if the requisite controlling facts are undisputed and clear." *Id.* The party claiming accord and satisfaction bears the burden of proof. *Daube & Cord*, 454 N.E.2d at 894.

Bamber relies on the Zapf Compromise and Settlement in support of his claim of accord and satisfaction. This settlement, however, was not a contract between Bamber and the Zapfs. It was, as expressly stated in the Joint Motion for Approval, a settlement between the Zapfs and the bankruptcy estate. (*See* Joint Motion for Approval of Compromise and Settlement of Zapf Claims, ECF No. 71-2 at Exhibit B Page 192.) Moreover, it was in settlement of claims against the estate, not claims against Bamber individually. The bankruptcy court's consideration and approval of the settlement was grounded in whether it was in the best interests of the estate. *See In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007); *see also* Fed. R. Bankr. P. 9019(a) (providing that a court may approve a compromise or settlement on motion by the trustee and after notice and a hearing). The Compromise and Settlement provided no clear understanding that any of Bamber's obligations under the Standstill Agreement were being fully satisfied through the resolution of the Zapfs' claims against the bankruptcy estate. To the contrary, the Zapf Compromise and Settlement declared that "[t]he Zapf Settlement shall not constitute a waiver or release of any claims the Zapfs may assert or have already asserted against

Dennis Bamber individually." (Joint Motion for Approval of Compromise and Settlement of Zapf Claims, ECF No. 71-2 at Exhibit B Page 194.) Because Bamber and the Zapfs did not arrive at a "meeting of the minds" that the settlement in the bankruptcy proceedings was in full satisfaction of the Zapfs' claims against Bamber under the Standstill Agreement to turn over any payments for Bamber's secured debt, it does not constitute accord and satisfaction. Applying the terms of paragraph 10 of the Standstill Agreement, the Zapfs are entitled to turnover of this payment to Bamber for secured debt, and the amount is to be applied to the New Jersey Judgment.

The Zapfs' remaining claim for $700,000 is based upon the trustee's dismissal of claims that the DBI estate had asserted against Bamber in an adversary action. The Zapfs argue that because Bamber used $700,000 of his $1 million claim to secure a waiver of these claims, it constitutes a payment to him that he must turn over to them. The Zapfs' characterization of the value of money given up in exchange for dismissal of adversary proceedings in bankruptcy as a "payment" does not find support in the plain and ordinary language of the Standstill Agreement. To find otherwise would require the Court to improperly add provisions not agreed upon by the parties. Bamber did not actually receive any money, and, moreover, any valuation placed upon what he did receive is riddled with speculation and assumption. Bamber is entitled to summary judgment on the Zapfs' claim for turnover of $700,000.

## C.     Declaratory Judgment

Bamber has sought, through his Complaint for Declaratory Judgment, a declaration of his rights under the Standstill Agreement and with respect to the torts of breach of fiduciary duty

and fraud. "By its terms, the Declaratory Judgment Act gives the district court the discretion to declare the rights of the litigants, 28 U.S.C. § 2201(a); it explicitly says that upon a proper application, the district court 'may' declare the party's rights." *Med. Assur. Co. v. Hellman*, 610 F.3d 371, 377–78 (7th Cir. 2010). As the Supreme Court has recognized, the Declaratory Judgment Act "place[d] a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) (stating that "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration").

Because resolution of the Zapfs' counterclaims for breach of contract, breach of fiduciary duty, and fraud provides an adequate remedy for Bamber, the Court declines to exercise its discretion to further declare the rights of the parties under 28 U.S.C. § 2201. Determination of these claims on the motions for summary judgment and partial summary judgment sufficiently and effectively resolves the questions related to the Standstill Agreement and the negotiation of the settlement in the New Jersey action. Through the resolution of the Zapfs' claims, there is no longer a reasonable threat of the action that prompted the declaratory judgment action. Accordingly, the portion of Bamber's Motion for Summary Judgment that requests judgment as a matter of law on his Complaint for Declaratory Judgment has been rendered moot.

## CONCLUSION

For the reasons stated above, Dennis Bamber and Third-Party Defendants, Barrington Music Products, Inc., Woodwind Contracting Group, Inc., and Bamber LLC, Motion for

Summary Judgment [ECF No. 62] is GRANTED IN PART and DENIED IN PART AS MOOT

and the Zapfs' Motion for Partial Summary Judgment [ECF No. 64] is GRANTED IN PART and

DENIED IN PART. Judgment will be entered in favor of Dennis Bamber, Barrington Music

Products, Inc., Woodwind Contracting Group, Inc., and Bamber LLC and against Stephen and

Richard Zapf on the claims for breach of fiduciary duty, fraud, and breach of contract except for

$300,000, which will be entered in favor of Stephen and Richard Zapf and against Dennis

Bamber.

SO ORDERED on May 16, 2012.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION